**MID–NEBRASKA BANCSHARES, INC., Petitioner,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent.**

No. 78–1658.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 1, 1979.

Decided Feb. 15, 1980.

Rehearing Denied March 6, 1980.

Lawrence F. Noble, Washington, D. C., with whom John V. Austin and Robert J. Routh, Washington, D. C., were on brief, for petitioner.

James V. Mattingly, Atty., Board of Governors of the Federal Reserve System, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Ronald R. Glancz, and Robert Kaplan, Attys., U. S. Dept. of Justice, and Neal L. Petersen, Gen. Counsel, Board of Governors of the Federal Reserve System, Washington, D. C., were on brief, for respondent.

Before WRIGHT, Chief Judge, TAMM, Circuit Judge, and JOYCE HENS

GREEN,* U.S. District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

This case involves the authority of the Federal Reserve Board to deny an application by the owner of two local banks to form a one-bank holding company [1] under the Bank Holding Company Act of 1956, 12 U.S.C. §§ 1841–1850 (1976), where the Board finds the affiliation of the two banks has anticompetitive effects that predate the application. Petitioner Mid-Nebraska Bancshares, Inc. argues that the Board may deny such an application only if the formation of the holding company itself will create or exacerbate adverse competitive conditions in a banking market. We reject this contention and affirm the Board's decision as supported by substantial evidence.

## I.

Dale Stine is president and a director of the North Loup Valley Bank (North Loup Bank), the only bank for the small town of North Loup in the cornbelt of Nebraska. In 1972, Stine obtained control of the Nebraska State Bank of Ord, Nebraska (NSB), the second largest bank in the Valley County area, which includes both Ord and North Loup. Both banks prospered under Stine. In 1977 he formed Mid-Nebraska Bancshares, Inc. (Bancshares) to become a one-bank holding company of NSB and applied to the Federal Reserve Board for approval.[2]

Under the Bank Holding Company Act (the Act), the Federal Reserve Board must approve all proposed acquisitions of a bank by a "company." [3] 12 U.S.C. § 1842(a)(1) (1976). The applicant files its request with its regional Federal Reserve Bank, which reviews the application and recommends approval or disapproval to the Board of Governors. 12 C.F.R. § 262.3(c) (1979). Once the Board itself has the application, it publishes a notice in the Federal Register, *id.* § 262.3(g)(1), and sends notice of the proposed transaction to state banking authorities where state banks are involved.[4] 12 U.S.C. § 1842(b) (1976).

By statute, the Board must review a variety of information in judging an application. "In every case, the Board shall take into consideration the financial and managerial resources and future prospects of the company . . . and the banks concerned, and the convenience and needs of the community to be served." *Id.* § 1842(c). The Act requires the Board to reject:

(1) any acquisition or merger or consolidation under this section which would result in a monopoly, or which would be in furtherance of any combination or con-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. A bank holding company is "any company which has control over any bank or over any company that is or becomes a bank holding company . . .." 12 U.S.C. § 1841(a)(1) (1976). A company controls a bank if it: "owns, controls, or has power to vote 25 per centum or more of any class of voting securities of the bank or company, . . . controls . . . the election of a majority of the directors or trustees of the bank . . ., [or] directly or indirectly exercises a controlling influence over the management or policies of the bank . . .." *Id.* § 1841(a)(2).

2. The Federal Reserve Board in 1976 rejected an earlier application by a Stine entity, Nebraska Banco Inc., to reorganize NSB as a one-bank holding company. *See* 62 Fed.Res.Bull. 638 (1978). The Board relied on the adverse competitive effects of the proposed transaction and the managerial and financial structure of the applicant in denying the application. *Id.*

3. Federal Reserve Board approval is not required for purchase of banks by individuals, for the definition of "company" does not include natural persons. *See* 12 U.S.C. § 1841(b) (1976). Thus, Stine's acquisition of NSB in 1972 was outside the Board's control. In 1978 Congress enacted the Change in Bank Control Act, Pub.L. No. 95–630, tit. 6, 92 Stat. 3641 (codified at 12 U.S.C.A. § 1817(j)(1) (West Supp. 1979)), which gives the appropriate federal banking agency the authority to disallow a purchase of a bank by an individual.

4. If the state banking authority disapproves of the transaction, a hearing is required, 12 U.S.C. § 1842(b); if it approves, a hearing generally is not held. In this case, the application received the approval of Nebraska officials, so the Board did not hold a hearing.

spiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or

(2) any other proposed acquisition or merger or consolidation under this section whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint o[f] trade, unless it finds that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.

*Id.*

In this case, Bancshares submitted its application to the Federal Reserve Bank of Kansas City (FRB–Kansas City). FRB–Kansas City reported favorably on the financial and managerial resources of the applicant. *See* Memorandum from Federal Reserve Bank of Kansas City to Clearing Unit, Division of Banking Supervision and Regulation, Board of Governors of Federal Reserve System (Jan. 9, 1978) [hereinafter cited as FRB–KC Report], *reprinted in part in* Appendix (A.) at 55–73. The FRB–Kansas City staff also concluded that North Loup Bank and NSB were located in the same "Valley County banking market"; moreover, the association of the two banks, consummated by Stine in 1972, had reduced competition between the banks, and "this adverse competitive situation would continue with approval of this application." FRB–KC Report at 13, *reprinted in* A. at 67. Despite this finding, the FRB–Kansas City staff recommended approval of the application because "there is little likelihood that denial of the application would result in the disaffiliation of [NSB] and deconcentration of the market." *Id.* at 15, *reprinted in* A. at 69.

The Board's staff agreed that North Loup Bank and NSB were part of the same market. Report of Division of Research and Statistics to Board of Governors of Federal Reserve System at 3 (June 2, 1978), *reprinted in* A. at 142, 144. The staff disa-

greed, however, with the recommendation by FRB–Kansas City that the application should be approved: "[E]ven if the Reserve Bank's conclusion is valid the affiliation was anticompetitive in its inception and should not be sanctioned through approval of the . . . application." Report of Division of Banking and Supervision to Board of Governors of Federal Reserve System at 2 (June 1, 1978), *reprinted in* A. at 131, 132.

The Board of Governors in a 3–2 vote followed its staff's recommendation and denied the application. It considered the effect of Stine's purchase of NSB and found that the 1972 transaction

eliminated significant competition that existed at that time between [NSB] and North Loup Bank, increased the concentration of banking resources within the Valley County banking market, and eliminated an independent banking competitor in the market. In the Board's judgment, that acquisition had an adverse effect on competition.

. . . On the basis of all facts of record, including the sizes of the organizations involved, their collective position in the relevant market (together the two banks hold 43.3 per cent of the market's total commercial bank deposits) and the limited number of banking alternatives in the market, the Board concludes that approval of this proposal would have significant adverse competitive effects.

*Mid-Nebraska Bancshares, Inc.* at 3–4 (FRB June 16, 1978) (order denying formation of bank holding company), *reprinted in* A. at 151–52. (footnotes omitted). The Board concluded that other factors of convenience and need did not outweigh this adverse competitive impact, and thus it rejected the application. Bancshares sought review in this court pursuant to 12 U.S.C. § 1848 (1976).

## II.

Bancshares first challenges the Board's power to consider anticompetitive effects arising not from the proposed transaction itself but from the earlier association of

NSB and North Loup Bank under Stine. Bancshares asserts that the only possible effects on competition occurred in 1972, when Stine purchased NSB in a transaction outside the Board's jurisdiction.[5] The application, argues Bancshares, must be judged on the anticompetitive effect that it alone creates. The formation of a bank holding company would have no incremental effect in Ord and North Loup but simply would continue the status quo in a different form. There being no anticompetitive effects created by the application, Bancshares believes that Board approval is required.

Even though the formation of the holding company may not change the competitive situation in the Valley County area, the Board may consider the anticompetitive effects caused by the 1972 purchase of NSB by Stine. As the provisions of the Act make clear, congressional regulations have applied to the "field of banking and bank holding companies the general purposes of the antitrust laws—to promote competition and to prevent monopoly . . .." S.Rep. No. 1179, 89th Cong., 2d Sess. 2 (1966), U.S.Code Cong. & Admin.News 1966, pp. 2385, 2386. The regulation of holding companies "is designed to bring under control those types of entities that may be used as media for acquiring and maintaining in perpetuity management and control of bank shares or assets." S.Rep. No. 1095, 84th Cong., 1st Sess. 7 (1956), U.S.Code Cong. & Admin.News 1956, pp. 2482, 2488. Congress thus has prohibited the formation of holding companies when they generate anticompetitive effects. 12 U.S.C. § 1842(c). In this case, Stine is attempting to change his control over one of the banks from direct, individual ownership, which Congress has permitted, to indirect, corporate control, which Congress has subjected to regulation by the Federal Reserve Board. In so doing, he has crossed the line that separates a safe harbor from stormy seas. Permitting the

Board to consider only the effects arising from an application itself would defeat Congress's specific purpose; it would allow an individual to aggregate significant banking assets and to circumvent congressional policies regarding competition simply by taking two steps—buying a bank and then applying for holding-company status—instead of one. Congress did not intend to restrict the Board's consideration of factors and thus allow such a simple means of evading the antitrust provisions of the banking laws.

This conclusion finds support in the Supreme Court's recent decision in *Board of Governors of the Federal Reserve System v. First Lincolnwood Corp.*, 439 U.S. 234, 99 S.Ct. 505, 58 L.Ed.2d 484 (1978). The Board had rejected an application by an undercapitalized bank to form a holding company even though the transaction itself would not further injure the bank's financial condition. The Court approved this result, holding that "the Board may deny applications for holding-company status solely on the grounds of financial or managerial unsoundness, *regardless of whether that unsoundness would be caused or exacerbated by the proposed transaction.*" *Id.* at 252, 99 S.Ct. at 515 (emphasis added). The Court reasoned, in part, that the Board could use the granting of holding-company status, which confers substantial benefits under the tax laws and other statutes,[6] to induce certain behavior from an applicant. *See id.* at 249–52, 99 S.Ct. at 513–14. Similarly, we do not believe that the Act, with its procompetitive policies, compels the Board not only to ignore existing anticompetitive conditions but also, in effect, to facilitate their continuation by lending its imprimatur to an applicant's activities. In refusing to give its approval, the Board is not revoking the 1972 purchase; it simply denies to Bancshares the tax advantages and permanent status that would help perpetuate the anticompetitive situation.

---

5. *See* note 3 *supra.*

6. Banks controlled by a holding company can file a consolidated tax return, thus allowing debts of the holding company to be deducted from the gross income of the consolidated enti-

ty. This deduction can provide a considerable tax savings. *See Board of Gov. of FRS v. First Lincolnwood Corp.*, 439 U.S. at 238 n.4, 99 S.Ct. 508 n.4.

### III.

■ Bancshares also challenges the sufficiency of the evidence supporting the Board's action in denying the request for holding-company status. Specifically, it contests the finding that the two banks were located in the same market and the conclusion that the affiliation had an anticompetitive effect. Both of Bancshares' arguments must be rejected.

### A. *Market Size*

Bancshares believes the Board erred in its determination that the North Loup Bank and NSB are in the same banking market. It agrees that the commercial banking industry is the relevant banking market but presents statistical evidence showing little overlap in customer service [7] between the two banks to argue that the banks are parts of distinct markets. If the banks operate in different markets, their affiliation does not have an anticompetitive effect.

This evidence of two markets, however, is too narrow. In evaluating the relevant banking market, the Supreme Court has stated: "[t]he proper question to be asked . . . is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." *United States v. Philadelphia National Bank,* 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915 (1963). The "area of effective competition" includes not only the area where the parties directly compete but also the market area "'to which the purchaser can practicably turn for [services].'" *Id.* at 359, 83 S.Ct. at 1739 (quoting *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961)) (emphasis by the *Philadelphia National Bank* Court).

Under this standard, the Board's determination that the two banks operate in the same geographic market is supported by substantial evidence. Ord, the county seat and commercial center of Valley County, is only ten miles from North Loup on a main highway. This proximity of NSB offers residents of North Loup a practicable alternative to satisfy their banking needs. The concentration of professional services available in Ord and the small size of North Loup (population 441) suggest that residents of North Loup may travel to Ord regularly, supporting the Board's finding that the relevant market includes both towns. This evidence is sufficient to support the Board's conclusion that the two banks are part of the same market.

### B. *Anticompetitive Effects*

Even if NSB and North Loup Bank operate in the same market, Bancshares contends that the evidence does not support a finding that holding-company status will have anticompetitive effects. It asserts that the Board applied too strict an antitrust standard to its proposal; under the proper test, Bancshares believes the holding company is not anticompetitive. We disagree and conclude that the Board applied the proper antitrust principles in finding Bancshares' proposal anticompetitive.

■ The Bank Holding Company Act requires the Board to deny applications that "would result in a monopoly," 12 U.S.C. § 1842(c)(1), would "substantially . . . lessen competition, or . . . tend to create a monopoly," or would "be in restraint o[f] trade," *id.* § 1842(c)(2). These provisions incorporate almost verbatim the language of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2 (1976), and section 7 of the Clayton Act, 15 U.S.C. § 18 (1976).[8] Thus, the standards generally applicable under antitrust law govern applica-

---

7. The survey shows that 3.5% of NSB's deposits come from the area served by North Loup Bank, and 4% of North Loup Bank's deposits are derived from the service area of NSB. A. at 133.

8. Section 7 of the Clayton Act does not apply to acquisitions by individuals. The provisions of the Sherman Act do apply to such acquisitions. *Compare* Clayton Act, § 7, 15 U.S.C. § 18 (1976), with Sherman Act, §§ 1–2, 15 U.S.C. §§ 1–2 (1976).

tions for holding-company status. *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 105, 95 S.Ct. 2099, 2111, 45 L.Ed.2d 41 (1975); *United States v. Third National Bank,* 390 U.S. 171, 181–82, 88 S.Ct. 882, 889, 19 L.Ed.2d 1015 (1969).

The Board properly applied these antitrust principles in rejecting Bancshares' application as anticompetitive. In this regard, the Supreme Court has stated that

> a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

*United States v. Philadelphia National Bank,* 374 U.S. at 363, 83 S.Ct. at 1741. The Court has also held that "intense congressional concern with the trend toward concentration warrants dispensing, in certain cases, with elaborate proof of market structure, market behavior, or probable anticompetitive effects." *Id.* More specifically, the Supreme Court has declared that combinations yielding banks with 36% (*United States v. Philadelphia National Bank*) and 23.4% (*United States v. Phillipsburg National Bank & Trust Co.,* 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970)) of the total deposits in a market are anticompetitive. Indeed, the Court noted in the *Philadelphia National Bank* decision: "Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat." *United States v. Philadelphia National Bank,* 374 U.S. at 364, 83 S.Ct. at 1742 (footnote omitted).

In this case, the merger of North Loup Bank and NSB gives Stine control of over 43% of the commercial banking market, making the combination the largest in the market.[9] A. at 142. The merger also eliminated one of the five banks in the Valley

County area. A regulatory scheme that restricts entry heightens the impact of the combination, for the difficulty of starting another bank effectively immunizes Stine's operations from new competition. Given Congress's concern with preserving competition in the banking industry, *see, e. g.,* H.R.Rep. No. 1221, 89th Cong., 2d Sess. 3 (1966), this evidence is sufficient to uphold the Board's determination that the application for holding-company status would be anticompetitive.

## C. *Convenience and Needs of Community*

Despite the finding of an anticompetitive effect, the merger can still gain approval if the combination serves the "convenience and needs of the community to be served . . . ." 12 U.S.C. § 1842(c)(2). Bancshares believes the application meets this standard. The Board, and we, disagree.

The Supreme Court discussed the "convenience and needs" standard in *United States v. Third National Bank,* 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968). It held that this defense to a finding of anticompetitive effect applies only when the merging bank is weak and other means of bolstering it are unavailable:

> If the injury to the public interest flowing from the loss of competition could be avoided and the convenience and needs of the community benefited in ways short of merger but within the competence of reasonably able businessmen, the situation is radically different. In such circumstances, we seriously doubt that Congress intended a merger to be authorized by either the banking agencies or the courts.

*Id.* at 189, 88 S.Ct. at 893. The Court concluded that "before a merger injurious to the public interest is approved, a showing [must] be made that the gain expected from the merger cannot reasonably be expected through other means." *Id.* at 190, 88 S.Ct. at 2047, *quoted in United States v. Phillipsburg National Bank,* 399 U.S. at 372, 90 S.Ct. at 893.

---

**9.** This share of the market grew from 39.4% at the time of Stine's purchase of NSB in 1972.

On the record in this case, Bancshares has not established that the application met this standard. The evidence shows that Stine helped resurrect the staid NSB by the introduction of new services, but Bancshares nowhere has proved that NSB previously was a weak competitor that merged only after other efforts at improving its competitive stance failed. Indeed, the evidence clearly indicates that NSB was the second largest bank in the market and serving its customers at a profit. Given this evidence, the Board properly rejected Bancshares' argument.

### IV.

We have carefully considered Bancshares' other arguments and find them to be without merit. Accordingly, the judgment of the Board of Governors is

*Affirmed.*