**COUNTY NATIONAL BANCORPORA-
TION and TGB Co., Petitioners,**

v.

**BOARD OF GOVERNORS OF the
FEDERAL RESERVE SYSTEM,
Respondent.**

**No. 79–1783.**

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 9, 1980.

Decided July 31, 1981.

---

**1254**

John P. Hawke, Jr., Arnold & Porter, Washington, D. C., for petitioners.

James V. Mattingly, Jr., Asst. Gen. Counsel, Board of Governors of the Federal Reserve System, Washington, D. C., for respondent.

Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, STEPHENSON, HENLEY, McMILLIAN and ARNOLD, Circuit Judges, en banc.

HENLEY, Circuit Judge.

County National Bancorporation (County National) and its nonoperating subsidiary, TGB Co., seek review of an order of the Board of Governors of the Federal Reserve System (Board) denying their applications to acquire control of T. G. Bancshares Co. (TG) under the Bank Holding Company Act of 1956 (BHCA), as amended, 12 U.S.C. § 1841 *et seq.*[1]

In its opinion filed September 3, 1980, and later withdrawn, a panel of this court, Circuit Judges Henley and McMillian and The Honorable Roy W. Harper, United States Senior District Judge, Eastern District of Missouri, sitting by designation, concluded the Board's decision should be vacated. Similarly, on rehearing the court *en banc* concludes that the Board's decision should be vacated and the cause remanded.

On April 6, 1979 petitioner County National, a multibank holding company, applied to the Board for approval of applications to acquire one hundred per cent of the voting shares of TG, an unaffiliated bank holding company. County National proposed to accomplish the acquisition through the merger of TG into County National's subsidiary, TGB Co., a nonoperating company formed to carry out the merger. The applications were filed pursuant to section 3(a) of the BHCA, 12 U.S.C. § 1842(a).

County National, generally recognized as a "suburban bank" and headquartered in St. Louis County, Missouri, is the tenth largest banking organization in the State of Missouri and the sixth largest banking organization in the St. Louis market.[2] County National controls five banks with aggregate deposits of approximately 333.7 million dollars, representing around 1.6 per cent of the total deposits in commercial banks in the state and 3.2 per cent of the commercial bank deposits in the St. Louis market. County National's largest subsidiary or "lead" bank is the St. Louis County Bank which is one of the seven largest banks in the St. Louis market.

TG, generally recognized as a "city" bank and headquartered in the City of St. Louis, is the thirteenth largest banking organization in the state and the tenth largest banking organization in the St. Louis market. TG controls three subsidiary banks with aggregate deposits of approximately 225.6 million dollars which represent around 1.1 per cent of the total commercial deposits in the state and 2.3 per cent of the total commercial deposits in the St. Louis market. TG's largest subsidiary or "lead" bank is the Tower Grove Bank & Trust Co. (Tower Grove Bank) which has deposits of over 150 million dollars and is among the seven largest banks in the St. Louis market.

---

1. This court has jurisdiction to review orders of the Board under section 9 of the BHCA, 12 U.S.C. § 1848.

2. The banking market area of St. Louis, Missouri consists of the City of St. Louis, St. Louis County, some adjoining Missouri counties and some counties and parts of counties in western Illinois.

County National and TG directly compete within the St. Louis market. County National's "lead" bank, St. Louis County Bank, is located only nine miles from TG's largest subsidiary bank, Tower Grove Bank. Moreover, County National's other subsidiary banks are located anywhere from 1.5 miles to 25 miles from TG's three subsidiary banks. Because of the proximity of the two banks, there is a significant overlap in service areas. In fact, Tower Grove Bank derives about eight per cent of its total deposits and thirty-five per cent of its total loans from the primary service areas of St. Louis County Bank. Furthermore, St. Louis County Bank derives approximately seventy-nine per cent of its deposits and fifty-nine per cent of its loans from the primary service area of Continental Bank & Trust Co. which is the TG subsidiary bank located closest to the St. Louis County Bank.

The proposed merger would result in County National becoming the seventh largest banking organization in the state with 2.7 per cent of the total state-wide commercial bank deposits and the fourth largest banking organization in the St. Louis banking market with 5.6 per cent of the total market deposits.

As indicated, this case arises under the provisions of the BHCA of 1956, 12 U.S.C. § 1841 *et seq.*, as amended. Under the terms of the statute, it is unlawful for any company to acquire control of a bank without prior approval of the Board. · 12 U.S.C. § 1842(a), as amended.[3] In determining whether to approve a proposed transaction, the Board is directed under section 3(c), 12 U.S.C. § 1842(c), as amended, to consider various matters including questions whether the proposal will violate certain antitrust standards.[4]

It is the interpretation and application of section 3(c) that determines the case at bar.

Applying the statute to the present case, the Board by a divided vote denied the petitioners' applications. The Board found that the merger, if allowed, would result in the elimination of existing competition between two aggressive and effective competitors and a harmful concentration of banking resources in the state as well as in the St. Louis banking market. The Board fur-

---

**3.** 12 U.S.C. § 1842(a), as amended, provides in part that:

> (a) It shall be unlawful, except with the prior approval of the Board, (1) for any action to be taken that causes any company to become a bank holding company; (2) for any action to be taken that causes a bank to become a subsidiary of a bank holding company; (3) for any bank holding company to acquire direct or indirect ownership or control of any voting shares of any bank if, after such acquisition, such company will directly or indirectly own or control more than 5 per centum of the voting shares of such bank; (4) for any bank holding company or subsidiary thereof, other than a bank, to acquire all or substantially all of the assets of a bank; or (5) for any bank holding company to merge or consolidate with any other bank holding company. . . .
>
> A bank holding company is defined in 12 U.S.C. § 1841(a), as amended, as any company . . . (1) that directly or indirectly owns, controls, or holds with power to vote 25 per centum or more of the voting shares of each of two or more banks or of a company that is or becomes a bank holding company . . . or (2) that controls in any manner the election of a majority of the directors of each of two or more banks; . . .

**4.** Section 3(c) provides in part that:

> (c) The Board shall not approve—
> (1) any acquisition or merger or consolidation under this section which would result in a monopoly, or which would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or
> (2) any other proposed acquisition or merger or consolidation under this section whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint [of] trade, unless it finds that the anticompetitive effects of the proposed transactions are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.
>
> In every case, the Board shall take into consideration the financial and managerial resources and future prospects of the company or companies and the banks concerned, and the convenience and needs of the community to be served.

ther determined that these adverse effects would not be offset by compensating benefits. The Board, however, did not affirmatively find that the proposed merger would violate the antitrust standards set forth in section 3(c)(1) and (2).

Petitioners contend that the Board may not consider anticompetitive factors more stringent than those mandated in sections 3(c)(1) and 3(c)(2). The Board, on the other hand, has taken the position that it may deny an acquisition on competitive grounds absent a finding of specific antitrust violations.

As originally enacted, the BHCA provided no definition of "convenience and needs" of the community, and section 3(c) did not emphasize specific antitrust standards. Instead, section 3(c) provided standards requiring the Board to consider various factors including the preservation of competition within the banking field.[5]

In 1966, however, the language was amended to its present form. The legislative history of the provision indicates that the language was changed to conform the standards governing Board review of cases involving bank holding companies to the standards governing review by the Federal Deposit Insurance Corporation in cases in-volving mergers of individual banks under section 5 of the Bank Merger Act (BMA), 12 U.S.C. § 1828(c)(5), as amended. *See* S.Rep.No.1179, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Ad. News 2385, 2393. The language of section 3(c) of the BHCA is thus virtually identical to that of section 5 of the BMA.[6]

The language of section 3(c) also closely parallels the language of certain antitrust standards. The antimonopoly language found in section 3(c)(1) is, of course, derived from section 2 of the Sherman Act. 15 U.S.C. § 2. Moreover, the language found in section 3(c)(2) incorporates, in part, other antitrust standards. The phrase "may be substantially to lessen competition, or to tend to create a monopoly" is identical to the standard imposed by section 7 of the Clayton Act, 15 U.S.C. § 18, while the "in restraint [of] trade" clause is lifted from section 1 of the Sherman Act, 15 U.S.C. § 1. Congress' substitution of specific competitive standards in the 1966 amendment for the general "preservation of competition" language used in the BHCA of 1956 arguably is strong indication that the antitrust standards were intended to be the sole measure of the competitive effects of a proposed transaction.

---

**5.** Section 3(c) initially read as follows:

In determining whether or not to approve any acquisition or merger or consolidation under this section, the Board shall take into consideration the following factors: (1) the financial history and condition of the company or companies and the banks concerned; (2) their prospects; (3) the character of their management; (4) the convenience, needs, and welfare of the communities and the area concerned; and (5) whether or not the effect of such acquisition or merger or consolidation would be to expand the size or extent of the bank holding company system involved beyond limits consistent with adequate and sound banking, the public interest, and the preservation of competition in the field of banking.

*See* The Bank Holding Company Act of 1956, Pub.L.No.511, Sec. 3(c), *reprinted in* 1956 Code Cong. & Ad.News 169, 171.

**6.** Section 5, 12 U.S.C. § 1828(c)(5), as amended, reads as follows:

(5) The responsible agency shall not approve—

(A) any proposed merger transaction which would result in a monopoly, or which would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or

(B) any other proposed merger transaction whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade, unless it finds that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.

In every case, the responsible agency shall take into consideration the financial and managerial resources and future prospects of the existing and proposed institutions, and the convenience and needs of the community to be served.

The thrust of the four-hour long debate of the 1966 amendment to the BMA on the House floor focused on whether the antitrust standards set out in section 1 of the Sherman Act and section 7 of the Clayton Act should be strictly applied to the banking industry or whether a "convenience and needs of the community" exception should be created. 112 Cong.Rec. 2440–67 (1966). Although the debate centered around the language of subsection B of section 5 of the BMA, there is no indication in the statute or its legislative history that the "convenience and needs of the community" language was intended to mean something different when used in subsection B than when it was used, only a few lines later, in the last sentence of section 5. Indeed, the Congressmen participating in the debate repeatedly spoke in terms of balancing the "competitive factor" against the "convenience and needs of the community." 112 Cong.Rec. 2440–67 (1966). Thus, while many Congressmen perceived competition, in this sense, to be a factor separate and distinct from the "convenience and needs of the community," only two, Congressmen Weltner and Todd, who opposed the statutory language of "convenience and needs of the community" and who voted in the minority, indicated in their statements that competition was part of the "convenience and needs of the community." *See* 112 Cong.Rec. 2457–59.

Two concerns developed after 1960 which Congress addressed with the 1966 amendment to the Bank Merger Act. The first was that bank regulatory agencies approved 90% of all merger applications filed between 1960 and 1966, 112 Cong.Rec. 2444 (remarks of Congressman Reuss), even though the 1960 BMA was passed to control the concentration of banking resources and the resulting decline in the number of commercial banks caused by unregulated mergers and consolidations. H.R.Rep.No.1416, 86th Cong., 2d Sess., *reprinted in* [1960] U.S.Code Cong. & Ad.News 1995, 1996–98. Congress perceived the cause of this problem to be that competition was only one of six equally weighted factors which the agencies were required to consider and was

not given special emphasis by the BMA. *See* H.R.Rep.No.1221, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Ad. News 1860, 112 Cong.Rec. 2441 (1966) (remarks of Congressman Patman).

Congressman Reuss, the author of section 5 of the 1966 amendment to the Bank Merger Act, said in the debates:

In contrast to the Bank Merger Act of 1960, which incorporated the so-called banking factors as six of the seven factors to be weighed in approving a bank merger by the appropriate bank supervisory agency, this bill would make *the competitive factor, as defined by the antitrust laws*, the primary factor to be used both by the bank supervisory agencies and the courts in determining whether to approve a merger.

112 Cong.Rec. 2444 (1966) (emphasis added).

The second concern arose from the Supreme Court decision in *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). In that case the Court held that asset acquisition-type mergers are within the ambit of the Clayton Act and that bank mergers which violate the anticompetitive standards of that Act cannot be validated on the ground that they would benefit the overall public interest. *Id.* at 335–49, 83 S.Ct. at 1726–1733. This decision is inconsistent with Congress' recognition in 1960 that some mergers are beneficial to the overall public interest even though they violate the antitrust laws. H.R.Rep.No.1416, 86th Cong., 2d Sess., *reprinted in* [1960] U.S.Code Cong. & Ad.News 1995, 2003.

Congress sought to correct these two problems with the 1966 amendment to the BMA. The 1966 amendment created new standards by which the bank regulatory agencies are to evaluate applications and by which the courts subsequently evaluate the legality of mergers in antitrust actions brought by the Justice Department. Both the agencies and the courts must uniformly apply the same standards. 12 U.S.C. § 1828(c)(7)(B); H.R.Rep.No.1221, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code

Cong. & Ad.News 1860, 1862. *See* 12 U.S.C. § 1849(b). These new standards give competition preeminent consideration by mandating that the agencies and courts first determine whether the proposed transaction violates the antitrust laws. *See United States v. Third National Bank of Nashville*, 390 U.S. 171, 181–82, 88 S.Ct. 882, 889–890, 19 L.Ed.2d 1015 (1967). They restrict an agency's discretion to approve transactions that have anticompetitive effects; thus, the standards foster Congress' desire to increase competition in the banking industry. It follows that a question is raised under the 1966 BMA amendment as to how far an agency may go to increase competition; may an agency, in its discretion, promulgate rules that promote a more competitive banking market than do the antitrust laws. The answer lies in Congress' method of correcting the problem created by *Philadelphia National Bank*.

By creating the "convenience and needs of the community" exception, Congress again recognized that some mergers that violate the antitrust laws are nevertheless in the public interest and that strict application of the antitrust laws by the courts is inappropriate for the banking industry. The exception requires the courts to mitigate the harsh consequences of strictly applying the antitrust laws. Given this purpose of the convenience and needs exception, it cannot be interpreted to allow the courts to apply a competitive standard that is more stringent than the antitrust standards. Since Congress specifically said that the courts and agencies are to apply identical standards, the conclusion must be that, like the courts, the bank regulatory agencies may not, in their discretion, apply a competitive standard that is more stringent than the antitrust standards.

In evaluating a proposed bank holding company transaction under its statutory mandate, the Board is first required to determine if a proposed transaction violates these antitrust provisions. If the proposed transaction "would result in a monopoly or . . . be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States," the Board must deny approval. Moreover, if the proposed transaction may have the effect "substantially to lessen competition," or "tend to create a monopoly," or "be in restraint [of] trade," the Board is again required to deny approval unless it finds that the anticompetitive effects of the proposed transaction "are clearly outweighed in the public interest" by the likelihood that the acquisition will further the convenience and needs of the community to be served. Finally, the closing sentence of section 3(c) directs that "in every case," the Board should consider various factors including the question whether the proposed transaction will serve the convenience and needs of the community.

The issue whether the Board is permitted under the final sentence of section 3(c) to deny an acquisition on competitive grounds absent a finding of an antitrust violation has been the subject of much dispute. Following enactment of the identical standard in the closing sentence of section 5 of the BMA, 12 U.S.C. § 1828(c)(5), the Board promulgated a regulation stating that adverse anticompetitive effects, even if not condemned by the antitrust laws, would be considered as relevant under the last sentence of the BMA, 12 C.F.R. § 250.182 (1969), and has consistently adhered to this policy. *See, e. g., United Banks of Colorado, Inc.*, 61 Fed.Res.Bull. 315 (1975); *Security Financial Services, Inc.*, 56 Fed.Res.Bull. 834 (1970). The interpretation has received the support of various commentators. Note, The 1966 Amendment to the Bank Merger Act, 66 Colum.L.Rev. 764, 874–85 (1966); Note, The 1966 Amendment to the Bank Merger Act: Economic Perspective and Legal Analysis, 29 Vand.L.Rev. 200, 226 (1966). *See also* Washington Mutual: A Judicial Amendment to the Bank Merger Act of 1966, 42 Geo.Wash.L.Rev. 639 (1974).

In *Washington Mutual Savings Bank v. FDIC*, 482 F.2d 459 (9th Cir. 1973), however, the Ninth Circuit held that under section

5 of the BMA[7] an agency does not have authority to apply a standard more stringent than the antitrust laws and to deny, solely on competitive grounds, an acquisition that would not violate the antitrust standards.[8]

The *Washington Mutual* court fully and accurately related the legislative history and the congressional purpose to achieve a uniform application of antitrust standards by both administrative agencies and the courts. And the *Washington Mutual* court specifically relied upon *United States v. Third Nat'l Bank*, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968), and *United States v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970). As Mr. Justice Harlan observed, when a proposed transaction is found not to violate the antitrust standard embodied in the BMA, the inquiry is over. *United States v. Third Nat'l Bank, supra*, 390 U.S. at 193, 88 S.Ct. at 895 (concurring in part and dissenting in part).

However, each of the Supreme Court cases upon which the *Washington Mutual* court relied, as well as *United States v. First City Nat'l Bank*, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967), involved suits by the government seeking enforcement of the antitrust laws. And in antitrust context the third level of inquiry to be made in the final sentence of section 5 of the BMA seems to have been subsumed in the determination of whether anticompetitive effects are offset in the public interest by the convenience and needs of the community. Thus, arguably these cases may not specifically answer the question whether an anticompetitive effect of a proposed acquisition under the BHCA may be cast into the balance of convenience and needs when that anticompetitive effect does not amount to an antitrust violation.[9]

More recently, the Fifth Circuit in *Mercantile Texas Corp. v. Board of Governors, etc.*, 638 F.2d 1255 (5th Cir. 1981), has had occasion to consider the Congressional purpose to establish "uniform" standards for consideration of anticompetitive effects of bank mergers and acquisitions by bank holding companies and to conclude that in evaluating anticompetitive factors the Board may not employ a standard more stringent than that of the Clayton Act tailored to the "convenience and needs" of the community. 638 F.2d at 1261.

The reasoning of the Fifth Circuit in *Mercantile* found support in part in *Washington Mutual, supra*, as well as in our panel opinion herein filed September 3, 1980 but later withdrawn on rehearing.

Whether section 3(c) permits the Board to apply a competitive standard more stringent than the antitrust standards poses a difficult question of statutory construction. In general, when confronted with such problems of statutory construction, this court has shown "great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). *See*

7. *See* note 6 *supra*.

8. Petitioners argue that the District of Columbia Court of Appeals reached this same conclusion in *Mid-Nebraska Bancshares, Inc. v. Board of Governors of the Federal Reserve System*, 627 F.2d 266 (D.C.Cir.1980). In that case, the court upheld the Board's authority to disapprove a bank holding company proposal because it would have substantial anticompetitive effects violative of the antitrust standards of section 3(c). Although the court noted that the competitive standards of section 3(c)(1) and (2) incorporate almost verbatim language from sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and section 7 of the Clayton Act, 15 U.S.C. § 18, nowhere does the court hold that the antitrust laws are the sole competitive stan-

dard by which the Board must evaluate a proposed transaction under the BHCA.

9. In *Board of Governors of the Federal Reserve System v. First Lincolnwood Corp.*, 439 U.S. 234, 99 S.Ct. 505, 58 L.Ed.2d 484 (1978), where no anticompetitive effect was involved, the Court held that the financial, managerial, and convenience and needs criteria of the closing sentence may serve as a basis for denial of a bank holding company application, but the Court did not address directly the question whether anticompetitive effects should be considered in evaluating a proposed transaction under the final sentence of section 3(c) of the BHCA.

*Blue Cross Ass'n v. Harris,* 622 F.2d 972 (8th Cir. 1980); *Minnehaha Creek Watershed Dist. v. Hoffman,* 597 F.2d 617, 626 (8th Cir. 1979); *Van Wyk v. Bergland,* 570 F.2d 701, 705 (8th Cir. 1978); *T. L. Hunt, Inc. v. Commissioner,* 562 F.2d 532, 535–36 (8th Cir. 1977).

On the other hand, it is, of course, also well settled that "courts need not defer to an administrative construction of a statute where there are 'compelling indications that it is wrong' ". *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94–95, 94 S.Ct. 334, 339–340, 38 L.Ed.2d 287 (1973). *See Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969).

■ With all due deference we cannot agree with the administrative determination that the Board has authority under section 3(c) to deny a merger on competitive grounds absent a finding of an antitrust violation. While section 3(c) provides that in every case the agency must consider the financial and managerial resources and future prospects of the companies or banks as well as the convenience and needs of the community, we are persuaded that the statutory language cannot be read as a grant of authority to consider any and all effects of the proposed transaction, including any and all competitive effects as those effects bear upon the convenience and needs of the community.

As we have noted, the legislative history and the Supreme Court have made it clear that uniformity of standards under the BMA and the BHCA was sought by Congress. And while the Supreme Court's opinions in *Phillipsburg, Third Nat'l Bank* and *First City Nat'l Bank* arguably may be distinguished from the present case on narrow grounds, what the Court has said in those merger cases largely applies to holding company applications as well. After all, it is difficult to justify having one set of anticompetitive standards in a merger case and a more restrictive set to be applied to a holding company.

We conclude that application of a standard stricter than the antitrust standards, as urged by the Board under the "convenience and needs of the community" language, is too rigid an evaluation of a proposed bank holding company transaction to effectuate Congress' banking policies. We hold that the "convenience and needs of the community," as that term is used in section 3(c) of the Bank Holding Company Act, does not include consideration of any anticompetitive effects that a proposed bank holding company transaction may have.

In sum, we hold that so far as anticompetitive factors are concerned the Board is limited to consideration of violations of the antitrust standards contained in section 3(c)(1) and (2) as it is under section 5 of the BMA.

■ It follows that the decision of the Board should be, and it is, vacated, and the cause remanded. Since the Board proceeded initially at least in part under an erroneous interpretation of legal criteria to be applied, we remand for de novo consideration of petitioners' application not inconsistent with this opinion.

HEANEY, Circuit Judge, with whom BRIGHT and McMILLIAN, Circuit Judges, join, dissenting.

I respectfully dissent. The majority opinion follows the Ninth and the Fifth Circuit Courts of Appeals in holding that the Federal Reserve Board cannot deny an acquisition of a bank by a bank holding company for adverse competitive reasons unless such rise to the level of a violation of the Sherman or Clayton Acts. In so doing, the majority rejects the plain language of the Amendment, ignores the legislative history and intent, disregards administrative regulations and rulings and inhibits competition in the banking industry at a time when it is obviously needed. In my view, the decision of the Federal Reserve Board should be affirmed.

I

The language of the statute belies the majority's reasoning. The last sentence in

section 3(c) requires that "*[i]n every case the Board shall take into consideration the financial and managerial resources and future prospects of the [applicant] and the banks concerned, and the convenience and needs* of the community to be served." 12 U.S.C. § 1842(c) (1976) (emphasis added).

The phrase "convenience and needs" has historically been construed by this Court and the Board to include consideration of anticompetitive effects. *See, e. g., Northwest Bancorporation v. Board of Gov's of the Fed. Res. Sys.*, 303 F.2d 832, 839–842 (8th Cir. 1962); *United Banks of Colo., Inc.*, 61 Fed.Res.Bull. 315 (1975); *First Bank Stock Corp.*, 46 Fed.Res.Bull. 486 (1960). The use of the phrase in the last sentence of section 3(c) preserves the mandate of its predecessor section that the Board consider *all* competitive impacts of a proposed acquisition. In so doing, it recodifies the ultimate test imposed by the statute—the public interest standard. *See United States v. Third Nat'l Bank in Nashville*, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968).

A recent scholarly Law Review Note put the matter well:

Although the convenience and needs criterion appears in both section [3(c)(2)] and the unlettered sentence, it cannot be assumed that the intended application of the criterion in each provision is identical. An anticompetitive element is no longer essential to the convenience and needs analysis in section [3(c)(2)] because that inquiry has already been made in determining whether the transaction violates either section 7 of the Clayton Act or section 1 of the Sherman Act. Thus, the convenience and needs analysis of section [3(c)(2)] is a balancing test that emphasizes procompetitive aspects of the proposed merger. The scope of the convenience and needs criterion in the unlettered sentence is not necessarily limited to procompetitive aspects * * *. The construction of the unlettered sentence does not appear to extract the anticompetitive element from the criterion. Instead of functioning merely as a repetition of the positive element in a balanc-ing equation, convenience and needs in the unlettered sentence should be construed as an independent standard that the banking agencies must consider in approving or disapproving proposed mergers. Both positive and negative aspects of that criterion, therefore, are left to the discretionary judgment of the regulatory agencies.

Note, *Washington Mutual: A Judicial Amendment to the Bank Merger Act of 1966*, 42 Geo.Wash.L.Rev. 639, 653 (1974).

## II

The purposes of the 1966 Amendment were limited. The first "was to permit certain bank mergers even though they tended to lessen competition in the relevant market." *United States v. Third Nat'l Bank in Nashville, supra,* 390 U.S. at 184, 88 S.Ct. at 890. The Amendment gave the Board the discretionary power to override the antitrust laws and *approve* a transaction that violates section 7 Clayton or section 1 Sherman. There is nothing in the legislative history of the Amendment to indicate that it was the intention of Congress to limit the discretion of the Board to consider anticompetitive effects under the convenience and needs standard of the unlettered sentence of section 3(c). *See* H.R. Rep.No.1221, 89th Cong.2d Sess. (1966), *reprinted in* [1966] U.S.Code Cong. & Ad. News 1860, 1862–1863. *See also* 112 Cong. Rec. 2443 (1966) (Remarks of Congressman Multer) (BMA).

The second purpose of the 1966 Amendment was to achieve uniformity of application by supervisory agencies and to prevent the federal courts from negating the public interest balancing test set out in the statute. Neither of these aims dictate that the Board evaluate the competitive impacts of an acquisition solely in conformity with antitrust standards.

Moreover, it appears that the Board, the FDIC and the Comptroller of the Currency were in substantial agreement concerning the scope of their discretionary authority at the time of the 1966 Amendment *See First Bank Stock Corp.*, 46 Fed.Res.Bull.

486, 496 (1960); *National Bank of Westchester*, Decision of the Comptroller of the Currency (Dec. 19, 1961); Note, *Washington Mutual: A Judicial Amendment to the Bank Merger Act of 1966*, 42 Geo.Wash.L. Rev. 639, 649–651 (1974). The legislative history reflects this as well. H.R.Rep.No. 1221, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Ad.News 1860, 1861.

Congress, noting that the banking agencies were in substantial agreement regarding the scope of their discretionary power, left this power untouched. In doing so, it recognized that an inflexible competitive standard is undesirable in a dual banking system. It knew that banks in the United States are chartered and overseen by both federal and state agencies. It understood that the anticompetitive impact of a proposed acquisition may differ markedly depending upon the state in which the transaction is proposed to occur. Since variations in state regulation produce appreciable differences in banking structures, Congress's acquiescence to the agencies' unified approach cements their authority to apply their standards in a way as to reflect such structural differences. *See* Note, *Washington Mutual: A Judicial Amendment to the Bank Merger Act of 1966*, 42 Geo.Wash. L.Rev. 639, 651 & nn. 86–88 (1974); *cf.* The McFadden Act of 1927, 12 U.S.C. § 36(c) (1976); Redford, *Dual Banking: A Case Study in Federalism*, 31 Law & Contemp. Prob. 749 (1966).

The majority's conclusion that uniformity is synonymous with the standard that is easiest to apply is shortsighted and ignores the realities of the banking industry and the purposes of the 1966 Amendment. Banks can presently predict that the supervisory agencies will uniformly deny transactions that have "adverse" competitive impacts on communities as well as those that violate antitrust standards. In the end, the petitioners appear to want a standard that makes it easier to allow acquisitions, not necessarily one that is predictable.

III

The majority relies heavily upon *Washington Mutual Savings Bank v. FDIC*, 482 F.2d 459 (9th Cir. 1973). In my view, that case was wrongly decided.

In *Washington Mutual*, the court ruled that the FDIC could not deny a merger application on the basis of a competitive standard more stringent than the antitrust laws. That court construed section 5 of the BMA as curtailing the discretion of the FDIC. It reasoned that since Congress intended for the banking agencies to uniformly review all mergers and similar transactions, such agencies may not consider competitive factors other than the antitrust laws. Finally, the court reasoned that the statute was primarily designed to reduce competition in the banking industry.

As noted, the legislative history of the 1966 Amendment indicates that the Amendment was not designed to limit the Board's discretionary authority to *deny* acquisitions found to be inimical to the public interest. Moreover, while it is clear that Congress intended to achieve uniformity in the agencies' approach to evaluating mergers and acquisitions, there is nothing in logic, legislative history nor experience to suggest that adherence to antitrust standards alone is the only way to secure that result. Such a leap of faith is unwarranted. Finally, the *Washington Mutual* decision does not take account of Congress's view that an effective banking system is necessarily keyed into reconciling the stability that results from *proper regulation* with the community benefits that result from *competition*. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 372, 83 S.Ct. 1715, 1746, 10 L.Ed.2d 915 (1963); H.R.Rep.No. 1221, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Ad.News 1860, 1861. *Washington Mutual* is grounded in the belief that the federal legislation that was passed in the 1930's favoring the reduction of competition in the banking industry is the controlling congressional intention today. This ignores recent precedent and the clear intent of the

1966 Amendment.[1] *See Board of Gov's of the Fed. Res. Sys. v. First Lincolnwood Corp.*, 439 U.S. 234, 243–248 & nn. 11–12, 99 S.Ct. 505, 510–513 nn. 11–12, 58 L.Ed.2d 484 (1978); *Mid-Nebraska Bancshares, Inc. v. Board of Gov's of the Fed. Res. Sys.*, 627 F.2d 266, 269 (D.C.Cir.1980).

## IV

The majority makes short shrift of the Supreme Court's stated principle "that an agency's longstanding construction of its statutory mandate is entitled to great respect, 'especially when Congress has refused to alter the administrative construction.' " *Board of Gov's of the Fed. Res. Sys. v. First Lincolnwood Corp., supra*, 439 U.S. at 248, 99 S.Ct. at 513 (quoting *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969)). The Board has long held that it has the authority to deny an acquisition that would have anticompetitive effects in an affected community, notwithstanding the absence of antitrust violations. *See United Banks of Colo., Inc.*, 61 Fed.Res.Bull. 315 (1975); *Security Fin. Serv., Inc.*, 56 Fed.Res.Bull. 834 (1970); *First Wis. Bankshares Corp.*, 49 Fed.Res.Bull. 181 (1963); *First Bank Stock Corp.*, 46 Fed.Res.Bull. 486 (1960). In 1969, the Board published its interpretive ruling that anticompetitive effects that fall short of antitrust violations will be considered as one of the relevant factors bearing on whether the Board will approve or deny a merger under the third step of the statutory test set out in the BMA. *See* 12 C.F.R. § 250.182(c) (1980). Although Congress has been made aware of the Board's practice, in the several times since 1966 that it has "revisited the Act * * * [it has] left the practice untouched." *Board of Gov's of the Fed. Res. Sys. v. First Lincolnwood Corp., supra*, 439 U.S. at 248, 99 S.Ct. at 513 (quoting *Saxbe v. Bustos*, 419 U.S. 65, 74, 95 S.Ct. 272, 278–279, 42 L.Ed.2d 231 (1974)).

It is entirely improper for this Court to legislate in an area intentionally left undisturbed by Congress.

## V

Policy considerations warrant a decision contrary to the majority. In *United States v. Philadelphia Nat'l Bank, supra*, 374 U.S. 321, 83 S.Ct. 1715, the Supreme Court noted that competition in the banking industry is not *per se* undesirable, and that in order to foster the country's fundamental national policy of competition, federal banking legislation should be construed to promote it, at least whenever such would not adversely affect the stability of our national banking structure or the availability of services from our nation's banks. *Id.* at 372, 83 S.Ct. at 1746.

The 1966 Amendment was intended to protect the public interest by empowering the Board to overcome the inflexibility of the antitrust laws. The majority's decision takes from the Board this flexibility. Moreover, it binds the hands of the Board and, thus, retards its continuing endeavor to foster the healthy competition that is a necessity to a responsible banking industry. *See* Note, *Washington Mutual: A Judicial Amendment to the Bank Merger Act of 1966*, 42 Geo.Wash.L.Rev. 639, 656–658 (1974); *see generally* Solomon, *Bank Merger Policy and Problems: A Linkage Theory of Oligopoly*, 89 Banking L.J. 116 (1972); Whitesell, *Potential Competition and Bank Mergers*, 88 Banking L.J. 387 (1971); Smith & Greenspun, *Structural Limitation in Bank Competition*, 32 Law & Contemp. Prob. 40 (1967); Kreps, *Modernizing Banking Regulation*, 31 Law & Contemp.Prob. 648 (1966).

It was necessary for Congress to empower the Board to approve acquisitions found to be violative of Clayton 7 and Sherman 1 in order to protect the soundness of our country's banking industry. The 1966

---

1. In *Mercantile Texas Corp. v. Board of Governors of the Fed. Res. Sys.*, 638 F.2d 1255 (5th Cir. 1981), the Fifth Circuit concluded that section 3(c) does not permit the Board to disapprove an acquisition without finding a violation of the antitrust standards incorporated into the statute. *Mercantile*, however, essentially determined that *Washington Mutual Savings Bank v. FDIC*, 482 F.2d 459 (9th Cir. 1973), and our panel decision were dispositive of the issue. The Fifth Circuit opinion thus suffers the same infirmities as the latter two decisions.

Amendment is premised on the belief that the agencies have the expertise required to modify the "negative parameters" of the Clayton Act. It follows, therefore, that this same expertise should be used to evaluate the significance of anticompetitive effects which are not technical antitrust violations. Note, *Washington Mutual: A Judicial Amendment to the Bank Merger Act of 1966,* 42 Geo.Wash.L.Rev. 639, 658 (1974) (footnote omitted).[2]

2. Here, the Board has not determined whether a section 3(c)(2) violation would result from the proposed acquisition. If it had determined that no such violation would occur, then it would have characterized the anticompetitive effect using the term "adverse" standing alone. *See* 12 C.F.R. § 250.182(c) (1980). Here, however, the Board characterized the effect of the acquisition as "seriously adverse." While it is not entirely clear what the Board means by this phrase, the word "seriously" certainly adds something to the term "adverse." On remand, the Board may determine that the proposed acquisition fails the test of section 3(c)(2) and deny the petitioner's application.